United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASANTE, et al.,

Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, et al.,

Defendants.

Case No. 14-cv-03226-EMC

**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; (2) GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 39, 51

Nineteen hospitals from Oregon, Nevada, and Arizona challenge California's Medi-Cal reimbursement policies for out-of-state hospitals. Compl. ¶ 1. Plaintiffs filed this action against California's Department of Health Care Services in June 2014. Docket No. 1 ("Compl."). Toby Douglas, Director of the California Department of Health Care Services, removed this action to federal court. Docket No. 1 (Not. of Removal). Plaintiffs bring the following causes of action: (1) violation of the Commerce Clause, Article I, Section 8, Clause 3 of the United States Constitution; (2) violation of the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution; (3) violation of the Equal Protection Clause of the California Constitution; (4) violation of federal laws governing Medi-Cal DSH payments (42 U.S.C. § 1396a(a)(13)(A)); and (5) violation of federal laws governing Medi-Cal payments to out-of-state hospitals. (42 U.S.C. § 1396a(a)(16) and 42 C.F.R. § 431.52). Plaintiffs seek a declaration that the Department violates these provisions and an injunction enjoining the Department from enforcing the law.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Federal Medicaid Program

Medicaid is a joint federal-state program that provides for the payment of medical services pursuant to the Medicaid Act to the poor, elderly, and disabled. 42 U.S.C. § 1396 *et seq.* States

that choose to participate in Medicaid must submit a State Plan to the United States Department of Health and Human Services ("HHS") for approval. The State Plan describes the policy and methods used to set payment rates for each type of service included in the program. *See, e.g.*, *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). The Centers for Medicare and Medicaid Services ("CMS") administers the Medicaid Program on the Secretary's behalf, including approving State Plans and State Plan Amendments. *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650, n.3 (2003); 42 C.F.R. §§ 430.10, 430.15(b). A state may change its plan by obtaining approval of a State Plan Amendment ("SPA") from CMS. The amendment must meet federal requirements. 42 U.S.C. §§ 1396a(b); 42 C.F.R. §§ 430.10, 430.12. The CMS reviews a state's State Plan and State Plan Amendments to determine whether they comply with the statutory and regulatory requirements governing the Medicaid Program. *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204 , 1208 (2012). If the CMS determines that a state is out of compliance with either the State Plan or the Medicaid Act, it may withhold federal funds. 42 C.F.R. §§ 430.15, 430.18, 430.35.

B. <u>The California Medi-Cal Program</u>

Medi-Cal is California's state Medicaid healthcare program. Cal. Welf. Inst. Code §§ 14000 *et seq*. California's Department of Health Care Services ("Department") is the single state agency responsible for the administration of Medi-Cal. Cal. Welf. Inst. Code § 10740. California has an extensive regulatory framework for the setting of reimbursement rates. *See e.g.*, Cal. Welf. Inst. Code §§ 14075, 14079, 14105. California's State Plan sets forth the standards and methods for reimbursement rates paid to Medi-Cal providers for Medi-Cal covered services. The United States makes contributions to a state's program provided the State Plan is consistent with the applicable Medicaid Act provisions. 42 C.F.R. § 430.35.

Medi-Cal is required to provide acute inpatient services that are not available in California pursuant to part 431.52(b) of Title 42 of the Code of Federal Regulations.[1] *See* Reimbursement to

---

[1] The Code of Federal Regulations states:

> (b) Payment for services. A State plan must provide that the State will pay for services furnished in another State to the same extent

United States District Court
For the Northern District of California

General Acute Care Hospitals For Acute Inpatient Services. D'S RJN, Ex. B, State Plan Amendment (SPA) 13-004, approved by CMS on May 31, 2013, Attachment 4.19-A at 17.52.

---

> that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the State, and any of the following conditions is met:
>
> (1) Medical services are needed because of a medical emergency;
>
> (2) Medical services are needed and the beneficiary's health would be endangered if he were required to travel to his State of residence;
>
> (3) The State determines, on the basis of medical advice, that the needed medical services, or necessary supplementary resources, are more readily available in the other State;
>
> (4) It is general practice for beneficiaries in a particular locality to use medical resources in another State.

42 C.F.R. § 431.52(b).

The Secretary adopted the regulation 42 C.F.R. § 431.52(b) to implement 42 U.S.C. § 1396a(a)(16). Section 1396a(a)(16) addresses services for beneficiaries who are absent from their home state. Under section 1396a(a)(16), a State plan must:

> (16) provide for inclusion, to the extent required by regulations prescribed by the Secretary, of provisions (conforming to such regulations) with respect to the furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom.

42 U.S.C. § 1396a(a)(16).

In the course of other litigation, the Secretary of Health and Human Services has interpreted 42 U.S.C. § 1396(a)(16) and the implementing regulation at 42 C.F.R. § 431. 52 to be:

> directed only at coverage services provided to recipients outside of their home State, not at ensuring that a certain payment level is achieved for providers. Thus, the Secretary interprets the language in Section 431.52, which requires that a State plan "pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries[,]" to mean that, if the State plan covers, for example, a heart transplant for a particular recipient if provided in the State, it also must cover a heart transplant to the recipient when he or she is out of the State.

D'S RJN, Ex. I at 19-20. Plaintiffs do not base any substantive claim on 42 C.F.R. § 431.52(b), presumably because the Secretary has assumed it is directed only at coverage and not at ensuring that the states achieve certain payment levels when reimbursing out-of-state hospitals. *See* Brief of the United States as *Amicus Curiae* at 19-20, *Children's Hosp. and Health Center v. Belshe*, No. C 95-1076 (N.D. Cal. March 1, 1995).

Title 42, Code of Federal Regulations, Section 431.52(b)(4), and title 22 California Code of Regulations, Section 51006, subdivision (a)(4)[2] recognize that it may be a common practice for Medi-Cal recipients in some areas of California to obtain medical services in adjacent areas in the states of Oregon, Nevada, and Arizona. California Regulatory Notice Register 2015, Number 25-Z, published June 19, 2015. D's RJN, Ex. B at 1007. In addition, in 2009, California amended Section 51543 of Title 22 of the California Code of Regulations. Section 51543 states:

> Out-of-state hospital inpatient services which have been certified for payment at the acute level and which are either of an emergency nature or for which prior Medi-Cal authorization has been obtained, shall be reimbursed the current statewide per diem average of contract rates for acute inpatient hospital services provided by California hospitals with at least 300 beds or the out-of-state hospital's actual billed charges, whichever is less.

Cal. Code Regs. tit. 22, § 51543

According to information published by the federal Medicare Program, there are over 3,000 hospitals across the country that may occasionally render services to a Medi-Cal beneficiary and

---

[2] The California Code of Regulations states:

> (a) Necessary out-of-state medical care, within the limits of the program, is covered only under the following conditions:
>
> (1) When an emergency arises from accident, injury or illness; or
>
> (2) Where the health of the individual would be endangered if care and services are postponed until it is feasible that he return to California; or
>
> (3) Where the health of the individual would be endangered if he undertook travel to return to California; or
> (4) When it is customary practice in border communities for residents to use medical resources in adjacent areas outside the State; or
>
> (5) When an out-of-state treatment plan has been proposed by the beneficiary's attending physician and the proposed plan has been received, reviewed and authorized by the Department before the services are provided. The Department may authorize such out-of-state treatment plans only when the proposed treatment is not available from resources and facilities within the State.

Cal. Code Regs. tit. 22, § 51006.

bill the Medi-Cal program for reimbursement.[3] Rowan Decl. ¶ 11. The Department claims that close to 3,000 out-of-state hospitals didn't provide any Medi-Cal covered hospital inpatient services to a single Medi-Cal beneficiary during state fiscal year 2013/2014.[4] Rowan Decl. ¶ 11. During that year, the nineteen plaintiff hospitals collectively rendered 859 Medi-Cal covered hospital stays resulting from admissions that were paid based on the APR-DRG methodology. Rowan Decl. ¶ 11. Twelve other out-of-state hospitals located in Arizona, Nevada, and Oregon that are within 55 miles of the California border rendered 143 Medi-Cal covered hospital stays. Rowan Decl. ¶ 12. 155 other out-of-state hospitals, not in proximity to the California border, rendered 338 hospitals stays. Rowan Decl. ¶ 12. While these stays represent only a small percentage of all Medi-Cal covered admissions paid under the APR-DRG methodology during state fiscal year 2013/2014, the amount of reimbursement at stake is not insignificant. For example, Renown Regional Medical Center Nevada Uncompensated Care Report (FY 30, 2013) states that the hospital's inpatient out-of-state Medicaid cost of care was $11,444,335; total outpatient out-of- state Medicaid cost of care was $1,385,992; total inpatient dual eligible Medicaid cost of care was $12, 710,938. Docket No. 55, Exhibit 2 at 161. The report does not break down these numbers by state. However, the Department estimates that the 15-020 Amendment will increase Medi-Cal out-of-state expenditures by $1.4 million per year. D's RJN, Ex. C at 1007.

1. APR-DRG Methodology

On July 1, 2013, the Department implemented All Patient Refined Diagnosis Related Group ("APR-DRG")[5] reimbursement methodology. Compl. ¶¶ 12, 13. All hospital patients are

---

[3] According to the December 22, 2011 Medi-Cal DRG Project Analytical Dataset Summary, Medi-Cal out-of-state hospital volumes included 2,151 stays and 1,303 days. Plaintiffs treated 1,385 of those Medi-Cal patients, which represents 64% of all Medi-Cal patients treated at out-of-state hospitals. P's MSJ, Ex. 2; Johnson Decl. Ex. 1 at 155-64, Table 3.8.2.

[4] Fiscal year 2013/2014 covered hospital admission dates during the period July 1, 2013 through June 30, 2014. Rowan Decl. ¶ 11.

[5] The APR-DRG methodology does not apply to psychiatric hospitals and units, rehabilitation hospitals and rehabilitation stays in general acute care hospitals, Indian Health Service hospitals, swing-bed days, administrative days, and 21 designated public hospitals. Rowan Decl. ¶ 4.

categorized into APR-DRGs. Rowan Decl.[6] ¶ 4 (Docket No. 51-3). Under the ARP-DRG methodology, the rate paid for Medi-Cal covered hospital in-patient stays is based in part on the All Patient Refined Diagnosis Related Group that a Medi-Cal patient is assigned to based on his or her diagnoses and other factors such as procedure codes, age, gender, admission date, and discharge date. *Id.* at ¶ 5. Each APR-DRG is assigned a numerical weight that reflects the typical hospital resources needed to care for the patient relative to the hospital resources needed to care for the average patient who is assigned an APR-DRG weight of 1.0. Vaida Decl.[7] ¶¶ 5, 8. (Docket No. 39-1). Thus, a patient who consumes 5 times the hospital resources needed to care for an average patient would be assigned an APR-DRG weight of 5.0. *Id.*

The Department's methodology for calculating a hospital's reimbursement for a particular patient is equal to the ARP-DRG weight of that patient times the hospital's "base price" times "policy adjustors." *Id.* For the base price, the Department uses either a "Statewide Base Price" or a "Remote Rural Base Price" to establish the rates for all hospitals, except hospitals paid based on a transitional base price (an incremental change in base price). Rowan Decl. ¶ 6. The current Statewide base price is $6,289 and the current Remote Rural base price is $12,768. *Id.* at ¶ 6.

For in-state hospitals, the Department adjusts the labor component of the "base price" of each California hospital by the highest of the following Medicare wage indices: (1) the Medicare wage index for the geographical area in which the hospital is located; (2) the California rural floor wage index; or, (3) the wage index for the area in which the hospital has been reclassified by Medicare. Vaida Decl. ¶ 10. The State Plan 13-020 provides that a uniform wage index 1.0 applies to all out-of-state hospitals, which means that the base price for an out-of-state hospital is not adjusted upward or downward. Rowan Decl. ¶ 8. In 2013, "18 of the 19 [out-of-state hospital] plaintiffs . . . had a wage index that was greater than 1.0." Vaida Decl. ¶ 12. According to the Complaint, "[a] California hospital with a wage index of 1.5 would have its 'base price'

[6] Chief of the Diagnosis Related Group (DRG) section of the Safety Net Financing Division, Department of Health Care Services. Rowan Decl. ¶ 1.

[7] Plaintiffs' expert in the area of health care reimbursement and health care statistics. Vaida Decl. ¶ 2.

increased by $2,141 ($6,223 times 68.8% times 0.5), or from $6,223 to $8,364." Compl. ¶ 16. Thus, "the California hospital with a wage index of 1.5 would receive 34% more per Medi-Cal discharge (i.e., $8,364 divided by $6,223) than an out-of-state hospital with the same wage index." *Id*.

The qualifications for the higher remote rural base price are laid out in the State Plan. The State Plan uses the Remote Rural Base Price only for hospitals that qualify as "remote rural." Rowan Decl. ¶ 8. California's rural wage index is calculated based on the wage costs of nine rural hospitals and then applied to 211 urban hospitals. Vaida Decl. ¶ 14. The Remote Rural Base Price is only available for California hospitals. Rowan Decl. ¶ 16. "Thus, a California hospital that is 'remote rural' would receive a 'base price' of $10,218, while an out-of-state hospital that is similarly situated would receive a 'base price' of only $6,223. In this case, the California hospital that is deemed to be 'remote rural' would receive 64% more per Medi-Cal discharge (i.e., $10,218 divided by $6,223) than an out-of-state hospital that is similarly situated."[8] Compl. ¶ 18.

With the third wage adjustment, the Department permits in-state hospitals to use Medicare wage index reclassifications that increase their index values, but does not extend that same benefit to out-of-state hospitals. Vaida Decl. ¶ 17.

According to the Complaint, the Department also applies "policy adjustors" that increase its payments for particular services. Compl. ¶ 19. First, for stays in a neonatal intensive care unit ("NICU"), California hospitals receive a 75 percent payment increase. Compl. ¶ 19. Second, the Department makes "outlier payments." Vaida Decl. ¶ 22. If a hospital's "estimated cost" for rendering services exceeds the Medi-Cal reimbursement by certain "thresholds," the hospital is entitled to "outlier" payments. Rowan Decl. ¶ 19. The "estimated cost" is determined by multiplying the hospital's cost-to-charge ratio (CCR) by the hospital's charges for the admission. *Id*. The Department annually receives a cost report from each California hospital to determine a hospital-specific CCR. *Id*. The Department claims it does not have access to cost reports for out-of-state hospitals. *Id*. Thus, "policy adjustors" are not available to out-of-state hospitals.

---

[8] In their calculations, Plaintiffs use the 2013 "base price" of $6,223 and "remote rural" price of $10,128. Compl. ¶¶ 16, 18, Vaida Decl. ¶ 11.

United States District Court
For the Northern District of California

According to Plaintiffs, the effect of the Department's reimbursement policies is even more pronounced when two or more of these policies are combined. For example, "a California hospital with a qualifying NICU and a wage index of 1.5 would receive 235% more per Medi-Cal discharge than a similarly situated out-of-state hospital[]." Compl. ¶ 20.

2. Disproportional Share Hospital Payments

Under the State Plan, Medi-Cal also makes Disproportional Share Hospital ("DSH") payments. DSH payments are supplemental payments to hospitals meeting DSH eligibility standards under applicable federal law and the State Plan. Chao Decl.[9] ¶ 3. DSH payments are made to eligible hospitals to compensate those which provide a disproportionate share of hospital services to Medicaid eligible and other low-income people that lack health insurance. *Id*. Federal law and the State Plan specify standards that a hospital must meet to be eligible for DSH payments. *Id.* ¶ 15. One requirement for DSH eligibility is that a hospital must either (a) have a Medicaid Inpatient Utilization Rate (MIUR) that is at least one standard deviation above the mean MIUR for all hospitals in the State receiving Medicaid payments, or (b) have a low income utilization rate (LIUR) that exceeds 25 percent. *Id*. Consistent with federal law and the State Plan, the Department performs the MIUR calculation and determination of the mean MIUR for hospitals "in the State." *Id*. The Department claims that it needs a massive amount of data to determine if a hospital qualifies for DSH payments. *Id*. For example, the Department requires California hospitals to perform the MIUR and LIUR calculations that include each hospital's inpatient days provided to Medicaid eligible patients of any state, total inpatient days, total Medi-Cal revenues received for all hospital services, cash subsidies from other government units, total revenues from all sources, total hospital charges for hospital inpatient services related to charity care, and total hospital charges for all inpatient services. *Id*. It has been longstanding policy in State Plan provisions that the Medi-Cal program makes DSH payments only to eligible California hospitals. *Id*. Thus, out-of-state hospitals have been categorically excluded from DSH payments.

---

[9] Chief of the Disproportional Share Hospital (DSH) Financing and Non-Contract Hospital Recoupment (NHR) Section of the Safety Net Division of the Department. Chao Decl. ¶ 2.

3. Recently Approved State Plan Amendment 15-020

On September 29, 2015, the Department obtained CMS approval of the new State Plan Amendment 15-020 ("15-020 Amendment"). Docket No. 59 at 2 ("D's Reply to P's Opp'n"); Rowan Decl. ¶¶ 21-26; Second Supp. Rowan Decl. ¶¶ 3-4. On June 19, 2015, the Department published notice that it was planning to submit a State Plan Amendment to CMS with proposed changes to the APR-DRG policies concerning the wage index, remote rural base price, NICU policy adjustment, and CCR with respect to out-of-state border hospitals. Rowan Decl. ¶ 21. The notice stated:

> It may be common practice for Medi-Cal recipients residing in some areas of California to obtain medical services in adjacent areas in the states of Oregon, Nevada and/or Arizona. In recognition of the role that border hospitals may play in providing services to those Medi-Cal beneficiaries, the Department intends to submit a SPA to further align payment standards applicable to California hospitals and [out-of-state] border hospitals to the greatest extent reasonably practicable.

Rowan Decl., Ex. C at 1007. (25-Z Cal. Regulatory Notice Reg. (June 19, 2015)).

The amendment defines "border hospitals" as those hospitals located outside of California that are within 55 miles driving distance from the nearest physical location at which a road crosses the California border, and includes all plaintiff hospitals. Rowan Decl. ¶¶ 11, 22.

The 15-020 Amendment provides for the following changes in the APR-DRG methodology that impact out-of-state border hospitals:

(1) For California hospitals and border hospitals, the Department will apply the same hospital specific wage area index value that the Medicare program applies to that hospital, further adjusted by the California Wage Area Neutrality Adjustment of .9797. Rowan Decl., Ex. B at 17.49.

(2) If a border hospital is defined as a rural hospital by the federal Medicare program and meets the California State Plan definition of a "remote" hospital and complies with the State Plan non-combined license/provider number standard, it will qualify for the remote rural base price. Rowan Decl. ¶ 24.

(3) A border hospital will qualify for the 1.75 policy adjustor for a neonate

United States District Court
For the Northern District of California

hospital stay if the hospital submits an application for neonatal intensive care unit status to California Children's Services. Rowan Decl. ¶ 25.

(4) For border hospitals, the cost-to-charge ratio used to determine outlier payments will be based on a formula using data from the Medicare average cost-to-charge ratios for operating and capital costs for hospitals in the state in which the border hospital is located. Rowan Decl. ¶ 25.

The effective date of these changes is July 1, 2015. Attachment 4.19-A, Docket No. 51-3 at 112. The Amendment does not change the Department's policy excluding DSH payments to out-of-state hospitals. According to Plaintiffs, out-of-state hospitals are also excluded from the California "rural" floor wage index, Medicare wage index reclassifications, and Medicaid cost-to-charge ratio. Plaintiffs also complain that under the new State Plan, the "remote rural" definition for out-of-state hospitals remains very restrictive. P's MSJ at14.

C. <u>The Parties</u>

Plaintiffs are hospitals located in Oregon, Nevada, and Arizona that treat a significant number of Medi-Cal beneficiaries.[10] They do so for two reasons. Compl. ¶ 1. First, Plaintiffs are the trauma facilities most conveniently available to Medi-Cal patients in Oregon, Nevada, or Arizona. [11] Compl. ¶ 9. As the California Court of Appeal noted in *Children's Hospital & Medical Center v. Bontá*, 97 Cal. App. 4th 740 (Cal. App. 1st Dist. 2002):

---

[10] Plaintiff hospitals are: Asante Ashland Community Hospital in Ashland, Oregon; Asante Rogue Regional Medical Center (Medford, Ore.); Asante Three Rivers Medical Center (Grants Pass, Ore.); University Medical Center of Southern Nevada (Las Vegas, Nev.); Renown Regional Medical Center (Reno, Nev.); Renown South Meadows Medical Center (Reno, Nev.); Sky Lakes Medical Center (Klamath Falls, Ore.); Southern Hills Hospital & Medical Center (Las Vegas, Nev.); Sunrise Hospital & Medical Center (Las Vegas, Nev.); Sunrise Mountain View Hospital (Las Vegas, Nev.); Valley View Medical Center (Fort Mohave, Ariz.); Havasu Regional Medical Center (Lake Havasu City, Ariz.); Centennial Hills Hospitals Medical Center (Las Vegas, Nev.); Desert Springs Hospital (Las Vegas, Nev.); Spring Valley Hospital Medical Center (Las Vegas, Nev.); Valley Hospital Medical Center (Las Vegas, Nev.); Northern Nevada Medical Center (Sparks, Nev.); Summerlin Hospital Medical Center (Las Vegas, Nev.); and Yuma Regional Medical Center (Yuma, Ariz.). Compl. ¶ 4.

[11] *See* Myron Gomez, M.D., Chief of Trauma Services at Renown Regional Medical Center. Gomez Decl. ¶ 2.

United States District Court
For the Northern District of California

> Unlike the vast majority of out-of-state hospitals, respondents are located close to the California border and serve bi-state regions encompassing large rural areas of California in which the level of medical care immediately available is considerably lower than that provided by respondents. [The] respondents "provide the full medical services needed for acute care Medi-Cal patients not just visiting the states of Arizona, Oregon or Nevada, but also those Californians who must avail themselves of [respondents' facilities] ... because they are the closest major trauma centers *available to Medi-Cal participants residing in California*." (original italics.) For example, because large numbers of Medi-Cal beneficiaries residing in California can so easily reach respondent Washoe Medical Center, located in Reno, Nevada, it treats more Medi-Cal patients than any other hospital in the nation located outside California. Moreover, due to the trauma care and other forms of intensive care respondent hospitals provide, they attract "Medi-Cal patients who are much sicker, and therefore require a greater expenditure of resources and costs, than the typical in-state Medi-Cal patient."

*Bontá*, 97 Cal. App. 4th at 760. One plaintiff, the University Medical Center of Southern Nevada, is the only Level I trauma center within a 200 mile radius of Las Vegas, NV. *Id.* ¶ 10. Another plaintiff, the Renown Regional Medical Center, is the only Level II Trauma Center between Sacramento, CA, and Salt Lake City, UT. Plaintiffs serve Medi-Cal patients from far northern and eastern reaches of California. *Id.* ¶ 9. These regions do not have many large medical facilities providing high levels of intensive care. *Id*. Defendants are the Department of Health Care Services and Toby Douglas. Toby Douglas is sued in his official capacity as Director of the Department.

## II. <u>REQUESTS FOR JUDICIAL NOTICE</u>

Without opposition from Plaintiffs, the Department requested judicial notice over nine exhibits: (A) Excerpt from California's State Medicaid Plan; (B) State Plan Amendment 13-004; (C) California Regulatory Notice Register 2000, Number 3-Z, published June 19, 2015; (D) Excerpt from the California Regulatory Notice Register 2000, Number 3-Z, published January 21, 2000; (E) Excerpt from the California Regulatory Notice Register 2000, Number 3-Z, published March 2, 2000; (F) May 31, 2013 approval Letter from Cindy Mann, Director of CMS, regarding State Plan Amendment 4.19-A; (G) December 5, 2013 approval Letter from Cindy Mann, Director of CMS, regarding State Plan Amendment 4.19-A; (H) Memorandum and Order, *Children's Hosp. and Health Ctr. v. Belshe*, United States District Court, Northern District of California, Case No.

C 95-01076 MHP, filed June 13, 2001; (I) Brief of the United States as *Amicus Curiae*, *Children's Hosp. and Health Center v. Belshe*, United States District Court, Northern District of California, Case No. C 95-1076, filed March 1, 1995. Defendants' Request for Judicial Notice in Support of Motion for Summary Judgment. ("D's RJN"), Docket No. 51-1.

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis in original).

The Court **GRANTS** the Department's request for judicial notice of Exhibits A–I. A trial court can take judicial notice of public documents in connection with a motion for summary judgment. *Cash Inn of Dade, Inc. v. Metro. Dade Cnty*, 938 F.2d 1239, 1242-43 (11th Cir. 1991). First, it is appropriate to take judicial notice of California's State Medicaid Plan and its legislative histories. *See, e.g., Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005) (granting plaintiff's request to take judicial notice of the legislative history of a state statute). Second, it is proper to take judicial notice of the court's own records in prior litigation related to the case before it. *Amphibious Partners, LLC v. Redman*, 534 F.3d 1357, 1361-62 (10th Cir. 2008) (district court was entitled to take judicial notice of its memorandum of order and judgment from a previous case involving the same parties); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); *see also United States v. Wilson*, 631 F.2d 118 (9th Cir. 1980) (stating that a court may take judicial notice of court records in another case). Notice can be taken, however, "only for the limited purpose of recognizing the 'judicial act' that the order represents on the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992)).

*See also General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082, n.6 (7th Cir. 1997) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"); *San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D. Cal. 2000) (quoting *Jones* for the proposition that a court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the litigation, but rather to establish the fact of such litigation and related filings"). Applying this standard, the Court takes judicial notice of the existence and legal effect of the memorandum and order in *Children's Hosp. and Health Ctr. v. Belshe*, United States District Court, Northern District of California, Case No. C 95-01076 MHP, filed June 13, 2001.

Third, it is proper to take judicial notice of the United States' *Amicus Curiae* brief. *Estate of Blue v. County of Los Angeles*, 120 F.3d 982, 984 (9th Cir. 1997) (noting that a court "may properly take judicial notice of the papers filed" in both federal and state court proceedings). "As the brief is not a 'fact,' legal or adjudicative, but only legal argument, Fed. R. Evid. 201 is not a bar." *Natural Res. Def. Council v. Sw. Marine, Inc.*, 39 F. Supp. 2d 1235, 1236 n.1 (S.D. Cal. 1999) *aff'd*, 236 F.3d 985 (9th Cir. 2000) (taking judicial notice of the U.S. Government's *amicus curiae* brief) . The Court takes notice of the argument contained in the amicus brief.

Finally, it is proper to take judicial notice of CMS's letters. *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1064 n.7 (9th Cir. 1998) (holding that state health department records were proper subjects of judicial notice); *Mack v. South Bay Beer Distribs, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (observing that the court may take judicial notice of the records and reports of state administrative bodies), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).

## III. <u>DISCUSSION</u>

### A. <u>Legal Standard</u>

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975), *cert. denied*, 423 U.S. 1025, 96 (1975).

United States District Court
For the Northern District of California

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the burden of establishing the absence of a genuine dispute of material fact. The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049-50 (9th Cir. 2014). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.*

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Id.* at 322-23. On cross-motions for summary judgment on the same issues, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

B. Plaintiffs' Statutory Claim to Disproportionate Share Payments

In order to assert claims for violations of 42 U.S.C. § 1396a(a)(13)(A), Plaintiffs must first establish that the statute in question creates a private cause of action. In *Cort v. Ash,* 444 U.S. 66 (1975), the Supreme Court set out a four-factor test for determining whether a federal statute implies a private right of action:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted, -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

> And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78 (citations and quotation marks omitted).

In two cases after *Cort*, the Supreme Court emphasized that congressional intent is the primary determinant in this inquiry. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76 (1979) (stating that "[t]he central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action" and that the remaining three factors are "traditionally relied upon in determining legislative intent."); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (reiterating that "[t]he dispositive question remains whether Congress intended to create any such remedy"). "[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transp. Workers Union of America*, 451 U.S. 77, 94 (1981).[12]

As demonstrated below, with regard to DSH payments, there is no evidence that Congress intended to confer enforceable rights and remedies upon health care providers under the current version of 42 U.S.C. § 1396a(a)(13)(A).

---

[12] The same analysis applies when the claim based on a statutory violation is brought under Section 1983:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action [under a federal statute] context . . . . Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries.

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (citations and internal quotations omitted).

In *Santiago ex rel. Muniz v. Hernandez*, 53 F.Supp.2d 264 (E.D.N.Y.1999), the district court explained:

> Both tests first ask whether a plaintiff is the intended beneficiary of a given statute. If a plaintiff fails to meet this intended beneficiary criterion, then the plaintiff does not have a federally enforceable right under § 1983 or a private right of action under the statute, and there is no need to consider the remaining *Blessing* or *Cort* factors.

*Id.* at 268.

United States District Court
For the Northern District of California

1. Section 1396a(a)(13)(A) and Section 1396r-4

Pursuant to 42 U.S.C. § 1396a(a)(13)(A)(2006), a state plan changing Medicaid rates must provide:

> (A) for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which --
> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
>
> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications
>
> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
>
> (iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs.

42 U.S.C. § 1396a(a)(13)(A).

In addition, section r-4(c)(3)(B), entitled "Payment adjustment," provides:

> [A] payment adjustment for a disproportionate share hospital must . . .
>
> (3) provide for a minimum specified additional payment amount (or increased percentage payment) that varies according to type of hospital under a methodology that—
>
> (B) results in an adjustment for each type of hospital that is reasonably related to the costs, volume, or proportion of services provided to patients eligible for medical assistance under a State plan approved under this subchapter or to low-income patients . . .

42 U.S.C. § 1396r–4(c)(3)(B).

By their plain language, neither Section 13(A) or 1396a(a) nor Section 1396r-4 contain express rights creating language that would confer private rights of action on health care providers. *See Gonzaga*, 536 U.S. at 287 (statutory provision fails to confer enforceable rights when it "entirely lack[s] the sort of 'rights-creating' language critical to showing the requisite

United States District Court
For the Northern District of California

Congressional intent to create new rights"); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979) (stating that rights-creating language "confer[s] a right directly on a class of persons that include[s] the plaintiff in the case" rather than "for the benefit of the public at large."; *ASW v. Oregon*, 424 F.3d 970, 975 (9th Cir. 2005) (stating that "[o]ur initial inquiry is whether the text and structure of the Act contains the requisite 'rights-creating' language that evinces a congressional intent to confer an entitlement to individualized payment determinations.") (internal citations omitted).

As a starting point, the current wording of the statute must be juxtaposed against prior language at issue in *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090 (9th Cir. 1999), on which Plaintiffs rely. Prior to 1980, states were required to reimburse hospitals "the reasonable cost[s]" of providing inpatient services. *Folden v. Washington State Dep't of Soc. & Health Servs.*, 981 F.2d 1054, 1056 (9th Cir. 1992). In response to concerns that the Medicaid reimbursement standard did not give enough authority to the states, Congress enacted the Boren Amendment as part of the Omnibus Reconciliation Act of 1980, Pub.L. No. 96-499, § 8962(a), 94 Stat. 2599 (1980). The Boren Amendment provided additional payments for disproportionate share hospitals. *Belshe*, 188 F.3d at 1093; *Children's Seashore House v. Waldman*, 197 F.3d 654, 656 (3d Cir. 1999). Disproportionate share hospitals are those hospitals that serve a larger number of Medicaid recipients and other low-income persons than other hospitals. Chao Decl. ¶ 3. The Boren Amendment also gave states greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." *Folden*, 981 F.2d at 1056. Importantly, however, the Boren Amendment required that states establish payment and reimbursement rates that were "reasonable and adequate" to cover the costs that must be incurred by efficiently and economically operated facilities. Omnibus Budget Reconciliation Act of 1980, Pub.L. No. 96-499, § 962(a), 94 Stat. 2599, 2650 (1980) (codified at 42 U.S.C. § 1396a(a)(13)) (repealed 1997).

In 1997, Congress amended the Medicaid Act to "eliminate the Boren Amendment and establish instead a notice and comment provision." *Exeter Memorial Hosp. Ass'n v. Belshe,* 145 F.3d 1106, 1108 (9th Cir.1998) (citing Balanced Budget Act of 1997, Pub.L. No. 105-33, 111 Stat. 251, § 4711, codified at 42 U.S.C. § 1396a(a)(13)(A)). Congress replaced "reasonable and

adequate" rate requirement in the Boren Amendment with a "public participation" process, which requires the states to publicize their reimbursement methodologies and subject them to public comment. U.S.C. § 1396a(a)(13)(A).

Plaintiffs urge this Court to follow the Ninth Circuit's decision in *Belshe*, 188 F.3d 1090. In *Belshe*, the Ninth Circuit held that the Boren Amendment unambiguously applied to out-of-state as well as in-state hospitals, and thus out-of-state hospitals could not be excluded from DSH payments. *Belshe*, 188 F.3d at 1097. However, the Ninth Circuit emphasized that its holding in *Belshe* was based on the now-repealed Boren Amendment. *Id.* at 1099. The *Belshe* court had no occasion to interpret the new statutory language of the Balanced Budget Act of 1997.[13]

The question before the Court is whether the Plaintiffs still have a private right of action under the § 1396a(a)(13)(A) as amended by the Balanced Budget Act of 1997 to challenge the Defendant's exclusion of out-of-state hospitals from DSH payments. The Court concludes that unlike the Boren Amendment, the current statute does not confer such a private right of action.

In *Children's Seashore House v. Waldman*, the Third Circuit squarely addressed this question. The Court held Congress removed a party's ability to enforce any substantive rights to payments when it replaced the Boren Amendment (and its "reasonable and adequate rate" requirement) with a requirement that a state establish a public process by which its rates would be determined. 197 F.3d 654, 659 (3d Cir. 1999). Specifically, the *Waldman* court stated that "it is clear that by amending a-13 in 1997, Congress eliminated the Boren Amendment's requirement that a state must provide . . . 'reasonable and adequate' [rates]." *Id.* at 659. By doing so Congress removed ability of a disproportionate share hospital to enforce any statutory substantive right to reasonable and adequate adjustment on account of treatment of Medicaid enrollees from another

---

[13] In January 2000, the Department implemented the revised § 1396a(a)(13)(A) (amended by the Balanced Budget Act of 1997) by publishing a notice in the California Regulatory Notice Register about its reimbursement policy for hospital inpatient services. D's RJN, Ex. D. The notice specified that "the Department plans to continue its longstanding policy of not making DSH payment adjustments to out-of-state hospitals for their treatment of Medi-Cal patients." D's RJN, Ex. D at 83. In March 2000, after providing a reasonable time for public comment and review, the Department published a final notice in accordance with the new § 1396a(a)(13)(A). D's RJN, Ex. E, Docket No. 51 at 12. The notice reiterated that the Department is not going to make DSH payments to out-of-state hospitals. D's RJN, Ex. E at 520-21.

United States District Court
For the Northern District of California

state. *Id*. The court explained:

> [I]t is clear that if Congress had not repealed the Boren Amendment in 1997, we would be bound to follow the holdings in *West Virginia v. Casey.*[14] But inasmuch as we based *West Virginia v. Casey* on our conclusion that Pennsylvania's denial of adjustments to out-of-state hospitals violated the "reasonable and adequate" requirement of a-13 as it then existed, *see* 885 F.2d at 29, we now must determine whether Congress's removal of the "reasonable and adequate" language from a-13 requires a different result than that we reached in *West Virginia v. Casey*. [W]e conclude that the repeal of the Boren Amendment does require a result different from that in *West Virginia v. Casey*.

*Id.* at 656-57. The court held that the public process provision did not confer a private right of action.

The court also held that a disproportional share hospital could not maintain an action for DSH adjustments under definitional provision 42 U.S.C. § 1396r-4. *Id*. at 660. Section § 1396r-4 sets the parameters of what is a DSH, what constitutes and adequate payment adjustment, and what limits are placed on federal financial participation and on state allotments for each year. *Id*. The court explained that unless section § 1396r-4 establishes an enforceable right on its own, the hospital does not have an enforceable statutory claim. "Yet, r-4 imposes neither procedural nor substantive requirements on a state that provide a basis for the [hospital] to press such claims. Rather r-4 is a definitional provision that describes certain procedures that a state must satisfy, such as submitting a qualified plan to the Secretary of Health and Human Services by a certain date to establish an adequate state disproportionate share hospital adjustment plan." *Id*. at 659. For these reasons, the Third Circuit affirmed the district's court dismissal of the hospital's section 1983 statutory claim and held that the hospital cannot maintain an action to enforce the Medicaid Act with respect to DSH adjustments. *Id*. at 660.

Although the Ninth Circuit has not ruled on the precise question here, in *Alaska Dep't of Health & Soc. Servs. v. Centers for Medicare & Medicaid Servs.*, 424 F.3d 931, 941 (9th Cir.

---

[14] Like *Belshe*, *West Virginia Univ. Hosps. Inc. v. Casey*, 885 F.2d 11, 17-22 (3d Cir.1989), *aff'd on other grounds*, 499 U.S. 83 (1991) held that a state cannot set disproportionately low rates for out-of-state hospital services, including DSH adjustments, merely because the hospital is an out-of-state provider.

United States District Court
For the Northern District of California

2005), the Ninth Circuit noted (consistent with *Waldman*) that in 1997, when Congress repealed the Boren Amendment and replaced it with the notice and comment rulemaking requirements, "Congress intended that there be no 'cause of action for [providers] relative to the adequacy of the rates they receive.'" (quoting *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 919 n. 12 (5th Cir. 2000) (citing H.R. No. 105-149, at 1230 (1997)). The H.R. report, cited in *Evergreen*, stated, "It is the Committee's intention that, following the enactment of the [Balanced Budget Act of 1997], neither this nor any other provision of [§ 1396] will be interpreted as establishing a cause of action for hospitals and nursing facilities relative to the adequacy of the rates they receive." Likewise in *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 543 (9th Cir. 2011), the providers claimed that the Department violated 42 U.S.C. § 1396a(a)(30)(A) by limiting reimbursement rates under California's Medicaid program. *Id*. The providers argued that the implementation of the statute was unlawful because it violated section 1396a(a)(30)(A)'s requirement that the states consider quality of care in setting Medicaid payment rates.[15] *Id*. Quoting *Alaska Department of Health*, 424 F.3d at 941, the court concluded that because no individual right has been created for providers relative to the adequacy of the rates they receive, the providers had no cause of action under § 1983. *Id*. at 547-48.

The Second and Fourth Circuits have also held that there is no private right of action after the repeal of the Boren Amendment by the Budget Reconciliation Act of 1997. *See e.g., New York Ass'n of Homes & Servs. for the Aging, Inc. v. DeBuono*, 444 F.3d 147, 148 (2d Cir. 2006) (affirming the district court's conclusion that plaintiff-providers' claims, based on sections 13(A) and 30(A) of the Medicaid Act, were "unenforceable against the defendants by providers through 42 U.S.C. § 1983" and its further conclusion that "§ 1396r does not create a federally enforceable right because it was obviously intended to benefit Medicaid beneficiaries, not providers."); *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (affirming the district's court conclusion in

---

[15] Title 42, United States Code, § 1396a(a)(30)(A) provides that state plans must: "assure that payment are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ." 42 U.S.C. § 1396a(a)(30)(A).

*HCMF Corp. v. Gilmore*, 26 F. Supp. 2d 873, 880 (W.D. Va. 1998) that "[w]ith the repeal of the Boren Amendment nothing remains that remotely resembles a federal right to reasonable and adequate rates"). *See also In re NYAHSA Litig.*, 318 F.Supp.2d 30, 39-40 (N.D.N.Y. 2004) *aff'd sub nom. New York Ass'n of Homes & Servs. for the Aging, Inc. v. DeBuono*, 444 F.3d 147 (2d Cir. 2006) (stating that providers cannot use § 1983 to enforce any rights contained in § 1396a(a)(30)(A)). *Cf. Am. Soc'y of Consultant Pharmacists v. Concannon*, 214 F. Supp. 2d 23, 29 (D. Me. 2002) (recognizing a limited private cause of action enforceable under § 1983 for violation of section 13(A)'s guarantee of a "reasonable opportunity to comment" on a change in the rate of service reimbursement).

The Court finds *Waldman*'s analysis persuasive and consistent with the thrust of Ninth Circuit decisions which have opined on the effect of the Balanced Budget Act of 1997. Plaintiffs have failed to state a private cause of action under 42 U.S.C. §§ 1396a(a)(13)(A) and 42 U.S.C. § 1396r-4.[16] Accordingly, the Court grants the Defendant summary judgment on Plaintiffs' claim under § 1396a(a)(13)(A).

C. The Dormant Commerce Clause

Plaintiffs contend that the disparity between the amounts the Department pays for Medi-Cal covered hospital in-patient stays to California and out-of-state hospitals violates the Commerce Clause. Compl. ¶¶ (26-29); P's MSJ at 16.

The Department argues the dormant Commerce Clause analysis does not apply here because the Medicaid program is authorized by Congress. The Department bases this argument on several grounds. D's MSJ at 14. First, Congress is spending federal funds to finance Medicaid. D's MSJ at 15. Second, Congress provided a "series of federal checkpoints" by delegating its authority to the Secretary of Health and Human Services. *Id*; *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982). In the alternative, the Department claims that even if the payments are subject to the dormant Commerce Clause analysis, the Department is exempt from Commerce

[16] Although Plaintiffs argue they are not suing under 42 U.S.C. § 1983 to enforce § 1396a(a)(13)(A), but rather, seeking a writ of mandate under C.C.P. § 1085, they cite no authority for the proposition that a federal court may issue a writ created by California law against the state government, especially when based on a federal statute which contains no private right of action.

Clause restrictions because it is a market participant. D's MSJ at 17.

1. Legal Standard

The Commerce Clause states that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3. Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce. The Commerce Clause both permits Congress to regulate commerce among the States and "also directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). This limitation on the states prohibits states from enacting laws that "benefit in-state economic interests by burdening out-of-state competitors." *Id.* Under the dormant Commerce Clause analysis, courts "protect [ ] the free flow of commerce, and thereby safeguard[ ] Congress' latent power from encroachment by the several States[ ]" when Congress has not affirmatively exercised its Commerce Clause power. *Merrion v. Jicarilla Apache Indian Tribe*, 455 U.S. 130, 154 (1982).

Thus, the threshold question in dormant Commerce Clause cases is whether Congress has exercised its Commerce Clause power in a particular field; if so, judicial review under the dormant Commerce Clause is precluded. *See Wyoming v. Oklahoma*, 502 U.S. 437, 457-58 (1992); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-93, (1984). For a statute to preclude dormant Commerce Clause review, however, congressional intent to authorize the challenged act(s) must be unmistakably clear. *E.g., Wyoming*, 502 U.S. at 458; *Wunnicke*, 467 U.S. at 91-92; *Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59, 66 (2003) ("Congress certainly has the power to authorize state regulations that burden or discriminate against interstate commerce, . . . but we will not assume that it has done so unless such an intent is clearly expressed.").

2. Congressional Authorization

The Department relies on *White v. Massachusetts Council of Const. Emp'rs, Inc.*, 460 U.S. 204 (1983) and *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) in arguing that Congress implicitly approved the practice of discrimination against out-of-state hospitals in respect to

Medicaid payments. D's MSJ at 14-16.

At issue in *White* was an executive order issued by Boston's Mayor requiring all construction projects funded by the city or by funds that the city had authority to administer, to be performed by a work force consisting of at least 50% residents of the city. *White*, 460 U.S. at 205-06. A number of the projects were funded in part with federal Urban Development Action Grants. *Id*. at 212. The Supreme Court held that the order did not violate the dormant Commerce Clause for two reasons. First, insofar as the city expended its own funds and projects, it was a market participant unconstrained by the dormant Commerce Clause. *Id*. at 215. Second, because the city expended federal funds, the order was "affirmatively sanctioned" by the federal regulations of those programs. *Id*.

The Department relies on the Court's statements in *White* that the federal regulations "affirmatively sanctioned" the executive order because Boston's construction project was funded by federal funds. D's MSJ at 16. The Department, however, reads too much into *White*.

In *White*, the Supreme Court examined the applicable statutes and found that the federal programs "were intended to encourage economic revitalization, including improved opportunities for the poor, minorities, and unemployed," particularly to distressed cities and urban counties[17]

---

[17] For example, 42 U.S.C. § 5318 ("Urban Development Action Grants") provides:

> (a) The Secretary is authorized to make urban development action grants to cities and urban counties which are experiencing severe economic distress to help stimulate economic development activity needed to aid in economic recovery.
>
> (b)(1) Urban development action grants shall be made only to cities and urban counties which have, in the determination of the Secretary, demonstrated results in providing housing for low- and moderate-income persons and in providing equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups. *The Secretary shall issue regulations establishing criteria in accordance with the preceding sentence and setting forth minimum standards for determining the level of economic distress of cities and urban counties for eligibility for such grants.*
>
> (d) (B) other factors determined to be relevant by the Secretary in assessing the comparative degree of economic deterioration in cities and urban counties: []

United States District Court
For the Northern District of California

*White* 460 U.S. at 213. Thus, the mayor's executive order was "harmonious" with federal law because "the federal regulations for each program affirmatively permit[ted] the type of parochial favoritism expressed in the order."[18] *Id.*

*White* is distinguishable from the case at bar for two reasons. First, as discussed below, the Department is not a market participant. Second, unlike in *White*, where the mayor's executive order was consistent with Congress' goal of improving the opportunities for the poor, minorities, and unemployed in targeted areas, here, the Department's policies are far from being in harmony with Medicaid. Moreover, in *White*, the implementing regulations expressly authorized "the type of parochial favoritism [towards distressed cities and urban counties] expressed in the [challenged] order.'" *Id*. at 215; 42 U.S.C. § 5318 (b)(1). No such geographic targeting was contemplated by Congress in enacting the Medicaid Act; nor has the Secretary promulgated regulations authorizing the discrimination challenged harmonious with Congress' intent. Indeed, if anything, Congress was concerned with ensuring that cross-border medical services be available to all Medicare recipients.

At its core, the purpose of the Medicaid Act is to enable "each state, as far as practicable under the conditions in such state, to furnish . . . medical assistance on behalf of families with

---

> (v) the extent to which the project will relieve the most pressing *employment or residential needs* of the applicant by –
> (I) reemploying workers in a skill that has recently suffered a sharp increase in unemployment *locally*;
> (II) retraining recently unemployed residents in new skills;
> (III) providing training to increase the *local* pool of skilled labor []
>
> (e) The Secretary may not approve any grant to a city or urban county . . . unless –
> [] (3) the grant will be used in connection with a project which will directly benefit the low- and moderate-income families and individuals *residing in the area* . . . .

42 U.S.C.A. § 5318 (emphasis added).

[18] The regulation implementing 42 U.S.C. § 5318 provided that "to the greatest extent feasible opportunities for training and employment arising in connection with the planning and carrying out of any project assisted under any such program be given to lower income persons *residing in the area of such project*...." 24 CFR § 135.1(a)(2)(i) (emphasis added). *White*, 460 U.S. at 213 n.11.

dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . ." 42 U.S.C. § 1396-1. As noted in *Belshe*, discrimination against out-of-state hospitals which provide medical care to residents of the state undermines that purpose.

The Department also argues that *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), shields the Department from the reach of the dormant Commerce Clause. In *Merrion*, the Commissioner of Indian Affairs, on behalf of the Secretary of the Interior, approved petitioners' leases with the Tribe to extract and produce oil and gas from the reservation. *Merrion*, 455 U.S. at 133-35. The Tribe was organized under the Indian Reorganization Act of 1934, which authorizes any tribe residing on a reservation to adopt a constitution subject to the approval of the Secretary of the Interior. *Id*. at 134. The Secretary approved the Tribe's Revised Constitution that allowed the Tribal Council "to enact ordinances, subject to approval by the Secretary of the Interior, to impose taxes and fees on non-members of the tribe doing business on the reservation." *Id*. at 135. (citing Revised Constitution of the Jicarilla Apache Tribe, Art. XI, § 1(e)). Pursuant to its Revised Constitution, the Tribal Council adopted an ordinance imposing a severance tax on oil and gas production on tribal land. *Id*. at 135-36. The Secretary then approved the ordinance. *Id*. at 136. The petitioners, non-Indian lessees producing oil and gas from within the tribe's reservation, challenged the tax on the grounds that the severance tax violated the dormant Commerce Clause. *Id*. at 135, 152-53.

The Department relies on *Merrion* for the proposition that "a series of federal checkpoints" for the Department's State plans and amendments authorizes the Department to discriminate against out-of-state hospitals. However, *Merrion* does not apply as broadly to this case as the Department suggests. In upholding the Apache severance tax, the Court observed that the ability to tax is an inherent power exercisable by all sovereigns. *Id*. at 141. It "simply does not make sense to expect the tribes to carry out municipal functions . . . without being able to exercise at least minimal taxing powers." *Id*. at 138 n.5. The Court also observed that Congress knew that Indian tribes were imposing mineral severance taxes such as the one challenged by the petitioners when it enacted the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq*. Section 3320(c)

defined, for purposes of the Act, "State Severance Tax" as any "severance, production, or similar tax . . . imposed on the production of natural gas . . . by any State or Indian Tribe." 15 U.S.C. § 3320(c), Repealed. Pub.L. 101-60, § 2(b), July 26, 1989, 103 Stat. 158.

The inherent sovereign power of a Tribe to tax is not at issue in the case at bar. While *Merrion* found that the Apache's taxing power was an inherent attribute of tribal sovereignty that has not been divested by Congress, *id*. at 152, that issue of sovereignty is not relevant here.

*Merrion*'s analysis in upholding the severance tax because Congress "has affirmatively acted by providing a series of federal checkpoints that must be cleared before a tribal tax can take effect," *id*. at 155, is more on point. Before the Tribe could impose a severance tax on non-Indian lessees, the Tribe had to pass three "federal checkpoints": the Secretary's approval of Merrion's lease with the Tribe, the Secretary's approval of the Tribe's Revised Constitution, as well as the Secretary's specific approval of the ordinance.

Nonetheless, *Merrion* is distinguishable. Congress has done far less here than in *Merrion*; unlike *Merrion*, it has not set up a "series of federal checkpoints." Although Congress delegated authority to approve state plan to CMS,[19] the administrative oversight of state Medicaid payments policies is limited to but one "checkpoint," wherein CMS reviews State plans. *See* 42 U.S.C. §§ 1396a(b); 42 C.F.R. §§ 430.10, 430.15(b). CMS has not promulgated any regulation expressly authorizing the discrimination challenged herein. Moreover, whereas in *Merrion*, Congress was "well aware that Indian tribes impose mineral severance taxes" of the sort in question, *Merrion*,

[19] The applicable Medicaid regulations state:

(1) "The State plan contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program." 42 C.F.R. § 430.10.

(2) "CMS regional staff reviews State plans and plan amendments, discusses any issues with the Medicaid agency, and consults with central office staff on questions regarding application of Federal policy." 42 C.F.R. § 430.14.

(3) "The Regional Administrator exercises delegated authority to approve the State plan and plan amendments on the basis of policy statements and precedents previously approved by the Administrator. [] The Administrator does not make a final determination of disapproval without first consulting the Secretary." 42 C.F.R. § 430.15 (b),(c)(2).

455 U.S. at 156, there is no evidence here that Congress expected or authorized states to discriminate in rate setting. Unlike *Merrion*, there is no unmistakably clear congressional intent to permit discrimination against out-of-state hospitals in respect to reimbursement under Medicaid.

The Fourth Circuit's decision in *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996) is persuasive on this point. In *Sierra*, the South Carolina Department of Health and Environmental Control promulgated a set of laws that restricted in-state treatment and disposal of hazardous waste generated in other states. 98 F.3d at 780. South Carolina argued that Congress affirmatively authorized the South Carolina laws when Congress delegated the authorization of state programs to the Environmental Protection Agency. *Id*. at 782-83. Under the Resource Conservation and Recovery Act of 1976 ("RCRA"),[20] Congress delegated to EPA the task of reviewing and authorizing state programs as consistent with the federal program. *Id*. at 779. RCRA allows a state to implement its own program in lieu of the federal program if the state's program is "equivalent to" and "consistent with" the federal program and provides for the "adequate enforcement of compliance." 42 U.S.C. § 6926(b).

In 1985, EPA gave South Carolina RCRA authorization to operate its waste program despite the argument that the program was "inconsistent" with federal law by imposing a discriminatory fee on waste generated out of state. Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), South Carolina submitted to EPA a Capacity Assurance Plan ("CAP").[21] CAP requires that each state submit a proposal to EPA demonstrating that over a 20-year period the state will have either: (1) adequate capacity

[20] RCRA establishes a national program for hazardous waste management administered by the EPA. RCRA encompasses most aspects of hazardous waste management, including identification of waste, standards for generators, transporters, and operators of treatment, storage, and disposal facilities, and procedures for permits. 42 U.S.C. §§ 6901-92k.

[21] Congress enacted other federal statutes to deal with the need to clean up improperly disposed hazardous waste. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") created a "Superfund" of federal money available for state cleanup efforts. 42 U.S.C. §§ 9601-75. Several years later, Congress amended CERCLA by enacting the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613 (1986). SARA requires each state to present a Capacity Assurance Plan ("CAP") to EPA. 42 U.S.C. § 9604(c)(9) (1995).

United States District Court
For the Northern District of California

available to dispose of hazardous wastes generated within the state; or (2) arrange for the disposal of wastes generated in-state in other states through interregional agreements. 42 U.S.C. § 9604(c)(9)[22]; *Sierra*, 98 F.3d at 779-80. South Carolina's CAP did not discriminate. South Carolina designed several laws that attempted to limit the level of out-of-state hazardous wastes entering its borders: South Carolina's legislature passed two statutes, its Governor signed two Executive Orders, and the South Carolina Department of Health and Environmental Control promulgated one regulation. *Sierra*, 98 F.3d at 780. EPA approved South Carolina's CAP and South Carolina's hazardous waste program under RCRA. *Sierra*, 98 F.3d at 781. Because South Carolina is one of the few states which had large hazardous waste treatment and disposal facilities, it attempted, through a series of measures, to reduce the amount of hazardous waste entering its borders. *Id*. at 780. South Carolina's legislature enacted a blacklisting provision that prohibited entry into the state of certain out-of-state wastes and imposed a discriminatory fee on waste generated out-of-state. *Id*.

When out-of-state waste facilities challenged South Carolina's waste program as violation

[22] 42 U.S.C. § 9604(c) provides:

> (9) Siting
>
> Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which –
> (A) have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20-year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,
>
> (B) are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,
>
> (C) are acceptable to the President, and
>
> (D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act. [42 U.S.C. § 6921 *et seq*.]

42 U.S.C. § 9604(c).

of the Commerce Clause, South Carolina asserted that RCRA and CERCLA embody a congressional exercise of the commerce power rendering the dormant Commerce Clause analysis irrelevant. *Sierra*, 98 F.3d at 782. First, South Carolina argued that under RCRA, Congress has expressly authorized any state program that meets "EPA's consistency standard of 'reasonableness.'" *Id*. at 782. The Fourth Circuit, rejecting the argument, stated that "[w]hile EPA may change its position on what 'consistency' entails, [23] the Constitution has not changed and, in the absence of a *clear Congressional statement authorizing discrimination by the states* with respect to hazardous wastes, we must apply the Constitution's dictates." *Id*. at 783. (citing *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 407-10 (1994)) (emphasis added).

Also, South Carolina, like the Department here, heavily relied on *Merrion* to argue that by delegating the authorization of state programs to the EPA under RCRA and CERCLA, Congress created a system of "checkpoints" for South Carolina's waste program. *Id*. at 782. The state argued that Congress's "checkpoints" affirmatively authorized the challenged state laws because EPA approved RCRA program and CAP. *Id*. at 782-83. The Fourth Circuit rejected the argument and distinguished *Merrion* for several reasons. First, unlike in *Merrion*, where Congress was aware that Indian tribes were imposing taxes on non-members, Congress did not anticipate or authorize a discriminatory fee for disposal of waste generated out of state. *See id*. at 784. Second, the court found that EPA had not expressly approved South Carolina's discriminatory laws; absent was "express congressional authorization." *Id*. at 784 n. 17.

Here, the Secretary of Health and Human Services engaged in the same type of administrative review similar to that described in *Sierra*. With little comment, CMS approved California's State Plan Amendments 13-033 and 15-020.[24] As in *Sierra*, and as noted above, the

---

[23] At different times, EPA has taken contradictory positions on how it will apply and interpret the consistency requirement. *Sierra*, 98 F.3d at 783 n.14. The EPA's regulation explaining how a state's program must be consistent with the federal program requires a state program not to unreasonably impede or restrict interstate commerce. *Id*. at 779 (citing 42 C.F.R. § 271.4).

[24] Approval letters from CMS Director state: "We conducted our review of your submittal according to the statutory requirements at sections 1902(a)(13), 1902(a)(30), 1903(a), and 1923 of the Social Security Act and the implementing federal regulations at 42 CFR 447 subpart C.[] We are enclosing the HCFA-179 and the amended plan pages." D's RJN, Ex. G; Rowan Second

CMS did not enact regulations authorizing the Department's discriminatory practices. D's RJN, Ex. G; Rowan Second Suppl. Decl. Ex. A. Nor is any evidence that Congress knew of and intended to authorize such practices.

The Department argues that Congress intended that states be allowed in particular to limit DSH payments to out-of-state hospitals (*see* D's Opp'n to P's MSJ, pp. 11-12). Though this argument was made on the merits in opposing Plaintiffs' claim that the Department violated federal statutory law, this contention could implicate the dormant Commerce Clause analysis as well. If Congress was unmistakably clear in authorizing states to exclude out-of-state hospitals from DSH payments, this would remove this aspect of discrimination from Commerce Clause scrutiny. The Court, however, finds no such clear authorization.

In support of its argument, the Department cites provisions from 42 U.S.C. § 1396r-4. In particular, the Department cites phrases such as "to a State" (subdivision(f)), "for hospitals in the State" (subdivision (f)(6)), "any hospital in such State" (subdivision (g)(2)(B)), "to hospitals in the State" (subdivision (h)(1)(B)), and "in the State" (subdivision (j)(2)).

However, the core of this argument was soundly rejected by the Ninth Circuit in *Belshe*:

> *Belshe* refers to the definitions section of the Medicaid statute, 42 U.S.C. § 1396r-4(b)(1)(A), which sets forth the requirements for a hospital to be eligible for DSH payments. That section defines hospitals eligible for DSH payments by comparing them to the mean of "hospitals receiving Medicaid payments in the State." *Belshe* argues this language proves that the DSH payment requirement in the Boren Amendment applies only to in-state hospitals. This argument fails.
>
> Section 1396r-4(b)(1)(A) provides that states administering their Medicaid programs are required to determine whether a hospital qualifies for DSH payments by referring to the mean number of Medicaid patients served by hospitals in their state. This language does not say that only hospitals within the state can qualify for DSH payments; instead, it uses in-state hospitals to calculate a benchmark for the number of Medicaid patients.

188 F.3d at 1096-97.

The Ninth Circuit's conclusion is underscored when reading the entirety of Section 1396r-

Suppl. Decl. Ex. A.

4 – throughout its lengthy text spanning from subdivision (a) through (j) with many subparts, reference is made repeatedly to "hospitals" without limiting them to in-state hospitals. Out of the scores of repeated references to hospitals generically, the Department is able to identify but a handful of references to hospitals "within the state," and these provisions pertain to the level of federal reimbursement to states which appear to be keyed to in-state hospital statistics and to reporting requirements. As in *Belshe*, none of these provisions say that "only hospitals within the state can qualify for DSH payments." 188 F.3d at 1096. Even if one or two provisions might be deemed to create some ambiguity in this regard,[25] none make Congress' authorization of the categorical exclusion of out-of-state hospitals from DSH payments "unmistakably clear." No provision expressly authorizes the exclusion of payments to out-of-state hospitals.

Parties seeking to establish that Congress has authorized otherwise invalid legislation face a heavy burden: "when Congress has not 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause, we have no authority to rewrite its legislation based on mere speculation as to what Congress 'probably had in mind.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982) (citations omitted). The Department has not met that burden. Absent unmistakably clear Congressional authorization, the dormant Commerce Clause analysis applies to all of the Department's policies at issue which exclude or discriminate against out-of-state hospitals.

3. Market Participant Exception

The Department contends that even if the Commerce Clause applies, the Department is exempt from Commerce Clause restrictions because it is a market participant. D's MSJ at 17. Under the market participant exception, a discriminatory law does not violate the Constitution if the state is acting as a market participant. *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277 (1988). For a state to be labeled a "market participant," however, a state must be acting as a private company would act, not "in its distinctive governmental capacity." *New Energy Co.*, 486 U.S. at 277. Conversely, when a state flexes its sovereign muscle to regulate the behavior of other

[25] Section 1396r-4(3) which refers to the possibility of a "statewide pooling arrangement" which would appear to include only in-state hospitals appears to raise the greatest ambiguity.

players in the market, the market participant exception does not apply. *See id.* at 277-78.

The Department contends that "[b]y using 50% of its own state funds to reimburse out-of-state hospitals" it is acting as a market participant because it is purchasing the medical treatment from Plaintiffs for Medi-Cal beneficiaries. D's MSJ at 17.

The market participant exception is inapplicable. The Department advanced the same argument in *Children's Hospital & Medical Center v. Bontá*, 97 Cal. App. 4th 740 (Cal. App. 1st Dist. 2002). The California Court of Appeal correctly rejected it. In *Bontá*, 11 out-of-state hospitals from Nevada, Oregon, and Arizona sued the Department claiming that the difference between the reimbursement of in-state and out-of-state hospitals for treatment of Medi-Cal beneficiaries violated the Commerce Clause. *Id*. at 747, 752. In *Bontá*, California's Welfare and Institutions Code provided that reimbursement for out-of-state acute inpatient hospital services provided to Medi-Cal beneficiaries shall not exceed the current statewide average of contract rates. *Id*. at 749. Out-of-state hospitals challenged the statute on the ground that the Department did not pay out-of-state hospitals the "current" statewide average of contract rates, but rather used a previous year's average of the different rates paid to in-state hospitals. *Id*. The plaintiffs alleged that in "[i]n an inflationary economy, such as the one that hospitals operate in, last year's average rate is always less than the 'current' rate." *Id.*

Addressing the Department's market participation argument, the Court of Appeal explained:

> The defects in this argument are readily apparent. First, the state is not itself a consumer of the service in question, nor does it pick and choose service providers. Discharging conventional regulatory responsibilities imposed on it by state and federal law, the state, through [the Department], merely reimburses those service providers selected by Medi-Cal recipients in need of medical care. The level of reimbursement [the Department] allows is clearly not responsive to market forces. Moreover, as [the Department] itself correctly points out in a different connection, there is no genuine private market regarding the delivery of care to Medi-Cal patients in which the state could participate. Though the treatment of Medi-Cal patients is less costly for in-state than out-of-state hospitals, it is in both cases inherently unprofitable; hospitals serve Medi-Cal patients only because they cannot legally refuse to do so. In sum, when it determines the level of compensation hospitals are entitled to receive for the treatment of Medi-Cal patients, [the Department] is

> not participating in an open market but simply carrying out a traditional state regulatory responsibility. The market participation exception therefore does not apply.

*Id.* at 768.

*Bontá*'s analysis of market participation is equally applicable here. First, the Department is not acting as a market participant because it controls the rates that out-of-state hospitals have to accept when they treat Medi-Cal patients. Second, the Department is not "pick[ing] and choos[ing] its business partners, its terms of doing business, and its business goals – just as it were a private party." *Id.* (internal citations omitted). Plaintiffs are legally obligated[26] to treat Medi-Cal patients as Plaintiffs are the only trauma facilities that can provide a high level of intensive care to Medi-Cal patients in Oregon, Nevada, and Arizona. Compl. ¶¶ 9-11. The Department's role in administering the federal-state Medicaid program is that of a sovereign, not a market participant.

4. Commerce Clause Analysis

Because the Department's policies are subject to the Commerce Clause, the Court addresses whether the Department's reimbursement rates for out-of-state hospitals violate the Clause. The dormant Commerce Clause "prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). Under the dormant Commerce Clause, the Court applies a two-step inquiry.

The first inquiry requires a court to determine whether "a state statute directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). If a state statute directly discriminates, it is "generally struck down . . . without further inquiry." *Id.*; *see also Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 338 (2008) (holding that a discriminatory state law is "virtually *per se* invalid" and "will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable

[26] Under the Federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), any hospital that accepts payment from Medicare must treat patients who seek emergency services without inquiry into the patient's insurance coverage or ability to pay. 42 U.S.C. § 13955dd.

nondiscriminatory alternatives" (citation and internal quotation marks omitted)). Laws that directly discriminate against interstate commerce are subject to strict scrutiny. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2875 (2014).

If the "statute has only indirect effects on interstate commerce and regulates evenhandedly," *Brown-Forman*, 476 U.S. at 579, the court then applies the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). That test upholds a state regulation unless the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." *Id.* at 142.

Discrimination is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99 (1994). A statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect. *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992).

a. <u>Plaintiffs' Commerce Clause Claim Before the 15-020 Amendment.</u>

Plaintiffs contend that under the APR-DRG reimbursement methodology, "[t]he [Department] pay[s] California hospitals significantly more money for every Medi-Cal patient treated than they pay California hospitals for the exact same services." Compl. ¶ 2. The stipulated facts confirm that the APR-ARG reimbursement scheme directly discriminates on its face against interstate commerce. In addition from being excluded from DSH payments, out-of-state hospitals have categorically been excluded from reimbursement adjustments accorded to in-state hospitals. In particular, the APR-ARG reimbursement scheme excludes out-of-state hospitals from various wage indices, rural, and policy adjustments (as well as DHS payments which this Court has determined in violation of statutory law):

> (1) The Department increases the labor component of the "base price" of each in-state hospital by using the Medicare wage index for the geographical area in which the hospital is located, but makes no such adjustment for out-of-state hospitals;

> (2) The Department increases the labor component of the "base price" of each in-state hospital by using the California "rural floor" wage index, but makes no such adjustment for out-of- state hospitals;
>
> (3) The Department increases the labor component of the "base price" of each in-state hospital by using the Medicare wage index for the area in which the hospital has been reclassified in California, but makes no such adjustment for out-of-state hospitals;
>
> (4) The Department has classified 52 in-state hospitals as "remote rural" and significantly increases their "base price," but makes it impossible for out-of-state hospitals to be classified as "remote rural";
>
> (5) The Department has classified 21 in-state hospitals as "NICU-Surgery," and increases by 75% the payments they receive for neonate cases, but makes it impossible for out-of-state hospitals to be classified as "NICU-Surgery";
>
> (6) In its outlier calculations the Department uses a hospital-specific CCR for each in-state hospital, but for out-of-state hospitals applies a fixed Medicare CCR of 22% that is much lower than the average Medi-Cal CCR of California hospitals.

P's MSJ at 16-17.

While the line between the *per se* rule and the *Pike* balancing test is not always clear, *see Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440-41 (1978) (recognizing that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause and the category subject to the *Pike v. Bruce Church* balancing approach), it is here. The Department rules clearly discriminate against out-of-state hospitals.[27]

To survive a constitutional challenge under the Commerce Clause, facially discriminatory laws must demonstrate both the existence of a legitimate, non-protectionist local purpose and the absence of nondiscriminatory alternatives. *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).

[27] The discrimination here is facial. For example, before the 15-020 Amendment, the Department applied a uniform wage index 1.0 to all out-of-state hospitals. Rowan Decl. ¶ 8. Thus, a California hospital with a wage index of 1.5 was receiving 34% more per Medi-Cal discharge than an out-of-state hospital with the same wage index. Compl. ¶ 16. In addition, a remote rural California hospital was receiving a base price of $10,218, while a similarly situated out-of-state hospital was receiving a base price of $6,223. Moreover, the Department estimates that the 15-020 Amendment will increase Medi-Cal out-of-state expenditures by $1.4 million per year. D's RJN, Ex. C at 1007.

Facially discriminatory state regulations must be stricken "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Company of Indiana v. Limbach*, 486 U.S. 269, 274 (1988). The Supreme Court has upheld only one such discriminatory law. *See Maine v. Taylor*, 477 U.S. 131, 141 (1986) (upholding Maine's statute banning the importation of live baitfish because of "significant threats to Maine's unique and fragile fisheries").

The Department attempts to overcome the presumption of invalidity by claiming 1) that out-of-state hospitals provided only .3% of all Medi-Cal covered hospital stays during state fiscal year 2013/2014[28] and 2) that it would have been administratively burdensome and potentially impossible for the Department to establish hospital specific wage indexes for all out-of-state hospitals, establish hospital specific cost-to-charge ratios for thousands of out-of-state hospitals, determine rural remote status for thousands for out-of-state hospitals, and determine whether any out-of-state hospital that decides to submit an application for a NICU status. D's MSJ at 7-9; D's Opp'n to P's MSJ at 6.[29]

To support its first argument, the Department claims "that out-of-state hospitals are not similarly situated to the designated public hospitals as Plaintiffs allege because, unlike the designated public hospitals, they do not serve an 'unusually large portion of California's uninsured and Medi-Cal populations.'" D's MSJ at 9. However, out-of-state hospitals are similarly situated inasmuch as they provide the same services to Medi-Cal beneficiaries. Additionally, in fact, Plaintiffs are the only large medical facilities available to California Medi-Cal beneficiaries residing in far northern and eastern reaches of California. Compl. ¶ 9. Indeed, Washoe, known as the Renown Regional Medical Center, "treat[s] more Medi-Cal patients than any other out-of-state

[28] The 19 plaintiff hospitals collectively rendered 895 Medi-Cal covered hospital stays resulting from admissions during fiscal year 2013/2014 that were paid based on the APR-DRG methodology. One plaintiff hospital had only 2 Medi-Cal admissions for a total of 4 days of care during fiscal year 2014/2014. Four other plaintiff hospitals had less than 10 Medi-Cal admissions for fiscal year 2013/2014. The admissions for 3 of those 4 plaintiffs involved less than 20 days of care. Rowan Decl. ¶ 11.

[29] For example, the task of determining whether a hospital meets the standards for being approved as a Regional or Community NICU, including meeting the CCS neonatal surgery standards, typically involves at least one field visit to the hospital. Dimand Decl. ¶ 6.

United States District Court
For the Northern District of California

hospital." Docket No. 39-4, ¶ 7 ("Plaintiffs' Findings of Fact"). The relatively low number of Medi-Cal hospital stays does not gainsay the fact that out-of-state hospitals are in fact similarly situated to in-state hospitals vis-à-vis Medicaid reimbursement. *Cf. Bontá*, 97 Cal. App. 4th at 766 (even slight disparity in treatment may violate the Commerce Clause); *Wyoming*, 502 U.S. at 455 ("The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce."); *Maryland v. Louisiana*, 451 U.S. 725, 760 (1981) ("We need not know how unequal [a] [t]ax is before concluding that it . . . discriminates.").

Likewise, the Department's administrative burden argument fails. This argument was already twice rejected in *Bontá* and *Belshe*. *Belshe,* 188 F.3d at 1098 (stating that the Department "could develop a reasonable methodology for reimbursement different from its in-state provider methodology."); *Bontá*, 97 Cal. App. 4th at 764 n.15 (stating that the Department did not explain why it cannot contract with the few large hospitals in nearby states that treat a significant number of Medi-Cal patients). As Plaintiffs point out, it "would not be administratively difficult for the Department to apply many of the same adjustments that it applies to in-state hospitals to out-of-state hospitals" for four reasons. Opp'n to D's MSJ at 10. First, it would be easy for the Department's employees to find an applicable wage index for a hospital in Nevada, Oregon, or Arizona. *Id*. Second, the Department can apply the same Medi-Cal cost-to-charge ratio to every out-of-state hospital. *Id*. at 11. Third, for remote rural base prices the Department would not have to evaluate "thousands of out-of-state hospitals" because even under the 15-020 Amendment only four plaintiffs would meet the requirements of remote rural hospitals. *Id*. Finally, only six plaintiffs might qualify for the 1.75 policy adjustor for a neonate stay. *Id*. There is no insurmountable burden to eliminate the challenged disparity.[30] Notably, the Ninth Circuit in *Belshe* permits less the perfect equality where it is not arbitrary and truly justified by

---

[30] As Plaintiffs point out, with respect to DSH payments, the Director may request the information necessary to provide DSH payments to the 19 plaintiff-hospitals. Opp'n to D's MSJ at 16. Moreover, several states make DSH payments to out-of-state hospitals. These states include Arizona, Connecticut, Florida, Iowa, Kansas, Minnesota, Pennsylvania, South Carolina, Virginia, and Washington. *See* Johnson Decl. ¶ 7.

administrative impracticability; though decided in the context of a statutory analysis, that logic could equally be applied to the Commerce Clause analysis. *See Belshe*, 188, F.3d at 1098.

In sum, the Department's claimed administrative burden in reimbursing out-of-state hospitals is insufficient to overcome the presumption of invalidity that attaches to practices which explicitly discriminate against interstate commerce. The lack of an insurmountable or even substantial administrative burden undermines any claim to a legitimate non-protectant local purpose. Nor has the Department established the absence of a nondiscriminatory purpose. *Cf. Maine v. Taylor*, 477 U.S. 131 (1986) (upholding a state ban on importation of live baitfish where the state demonstrated that there was no other adequate means to prevent the spread of invasive aquatic species).

The Court finds persuasive two cases which have examined issues closely related to that at issue here. In *Bontá, supra*, the California Court of Appeal struck down the Department's reimbursement practices that discriminated against out-of-state hospitals as unconstitutional. *Bontá*, 97 Cal. App. 4th 740. The court found the Department's discriminatory hospital reimbursement scheme violated the dormant Commerce Clause, even though the disparity in the treatment of in-state and out-of-state hospitals "[was] slight." *Id*. at 763. In *Bontá*, the Court of Appeal examined the "fundamental dissimilarities"[31] between the Department's treatment of in-

[31] For example, the Court of Appeal relied on the following factual determinations: "(1) the unweighted average of in-state contract rates for acute inpatient hospital services used by DHS as the basis for reimbursing out-of-state hospitals was 23.8 percent lower than a weighted average would be and the use of an unweighted average compensated respondents nearly $3 million less than they would have received if DHS employed a weighted average; (2) in-state contract rates consistently increased over time and that "use of a rate that is set on December 1, and not adjusted until the next year, inevitably results in out-of-state hospitals being paid less than the 'current' average contract rate," as mandated by state law implementing the Medicaid Act; (3) DHS annually distributes over $2 billion in disproportionate share adjustments to state hospitals, but "has never made a payment of disproportionate share moneys to any out-of-state hospital";[] (8) during the relevant time period (*i.e.*, Apr. 1, 1994 to Aug. 14, 2000) the expenses incurred by respondent hospitals in treating Medi-Cal patients that were allowable under the principles of cost reimbursement reflected in the Medicaid Act were $22,660,318, but the compensation respondents received for the services they provided such patients during that period was $14,696,955, which was "only sixty-five percent ... of their 'allowable costs' for the Medi–Cal patients they treated," "leaving a net shortfall based on 'allowable costs' (exclusive of interest) of $7,963,363"; and (9) under the reimbursement system employed by DHS prior to its use of the present system

state and out-of-state hospitals with regard to Medicaid payments for acute care services. *Bontá*, 97 Cal. App. 4th at 759-60. The court defined the discrimination broadly as "[a]ny disparity in the treatment of in-state and out-of-state interests – whether businesses, users, or products – . . . even if the disparity is slight") (*quoting* L. Tribe, American Constitutional Law, § 6-6, 1059-60). *Id*. at 763. Moreover, the court stated that if "discrimination is patent, . . . neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown in order to invalidate the law. Nor does a finding of 'discrimination' necessarily depend on economic analysis." *Id*. (internal citation omitted). The court applied "the most rigorous judicial scrutiny" to the Department's payment scheme and struck it down as facially discriminatory. *Id*. at 763-64. Because the Department did not present any valid defenses "unrelated to economic protectionism,"[32] the Department "obviously discriminate[d] against out-of-state hospitals . . . that treat significant numbers of Medi-Cal patients." *Id*. at 762, 764.

In *W. Va. Univ. Hospitals, Inc. v. Rendell*, No. CIV. 1: CV-06-0082, 2007 WL 3274409, at *11 (M.D. Pa. Nov. 5, 2007), the court invalidated Pennsylvania's Trauma DSH payment scheme. The issue in *Rendell* was whether the plaintiff, West Virginia University Hospitals, Inc. ("the Hospital"), was entitled to trauma disproportionate share hospital ("Trauma DSH") payments under the Pennsylvania Trauma Systems Stabilization Act, 35 P.S. §§ 6943.1 *et seq.* ("Trauma

---

respondents would have received $19,380,433 for the services they provided Medi-Cal patients during the relevant time period, leaving a net shortfall (exclusive of interest) of $4,683,478." *Bontá*, 97 Cal. App. 4th at 642-43.

[32] Instead, the Department argued that the disparate compensation of in-state and out-of-state hospitals was justified because it was impossible for the Department "to enter into a cost sensitive contract with 'every hospital across the nation,' most of which are distant and rarely treat Medi-Cal patients." *Bontá*, 97 Cal. App. 4th at 764 n.15. The Court of Appeal rejected the argument: "[The] Department does not explain why it cannot either contract with the relatively few large hospitals in nearby regions of adjacent states that treat significant numbers of such patients (if they are willing to make their cost figures available and submit to audits), or voluntarily comply with federally approved procedures for reimbursing out-of-state hospitals that require the reasonable costs of such hospitals to be taken into account . . . . Nor has [the Department] offered any explanation why large out-of-state hospitals that treat significant numbers of Medi-Cal patients and are willing to submit to the authority of [the Department] and the jurisdiction of California courts cannot be allowed administrative and judicial processes to challenge the adequacy of the compensation they receive." *Id.*

Act"). *Id*. at *1. Pennsylvania enacted the Trauma Act, which authorized the distribution of a new disproportionate share payment, the Trauma DSH, to Pennsylvania's trauma centers. *Id*. at *2. However, the statute limited the definition of "trauma center" to include only hospitals located within Pennsylvania. *See* 35 Pa. Cons.Stat. Ann. § 6943.2 (defining a hospital as "[a]n entity located in this Commonwealth that is licensed as a hospital [under the] Health Care Facilities Act."). *Id*. To escape the dormant Commerce Clause, the state argued that Pennsylvania was a market participant because the Trauma DSH payments were a permissible subsidy to domestic industry. *Id*. at *8. The court rejected this argument explaining that by definition the payments are a form of compensation for hospitals which provide a disproportionate share of trauma treatment for Medicaid patients. *Id*. at *9. The court concluded that Trauma DSH payments did not fall within the market participant exception because the payments were incorporated into the Medicaid State Plan, jointly funded by Pennsylvania and the federal government. *Id*.

Because the Trauma Act was facially discriminatory, the court invoked the *per se* rule of invalidity. *Id.* at *10. The state attempted to overcome the presumption of invalidity by claiming that the Trauma Act served a legitimate purpose of providing trauma care for Pennsylvania citizens. *Id*. According to Pennsylvania, that purpose would have been undermined if the state distributed scarce resources to out-of-state hospitals. *Id.* The court, however, explained that the state was undermining its important goal of improving access to trauma care for Pennsylvania citizens because out-of-state hospitals, as the Plaintiffs here, provided trauma care to a significant number of Pennsylvania residents.[33] *Id.* The court concluded that because Pennsylvania's statutory scheme excluded all out-of-state hospitals from Trauma DSH payments, the Trauma Act was *per se* invalid under the dormant Commerce Clause. *Id*. at *10.

For reasons noted above, the same reasoning applies to the instant case. Thus, the Department's APR-ARG reimbursement scheme as it relates to out-of-state hospitals along with the DSH payment policy are invalid under the dormant Commerce Clause.

---

[33] West Virginia University Hospital was located six miles from the border between West Virginia and Pennsylvania. *Id* at *2. Due to its proximity to the Pennsylvania border, the hospital treated more than 400 Pennsylvania medical assistance inpatients per fiscal year. *Id*.

b. Plaintiffs' Commerce Clause Claim After the 15-020 Amendment.

As discussed above, the 15-020 Amendment (1) will apply the same wage index policy for California hospitals and border hospitals; (2) will apply the "remote rural" base price to border hospitals that are determined to be "rural" by the Medicare program; (3) border hospitals will qualify for 1.75 policy adjustors; and (4) the cost-to-charge ratio will be based on the Medicare reported average CCRs. Rowan Second Suppl. Decl. ¶ 4, Docket No. 59-1.

The Department claims that the 15-020 Amendment "addresses most, if not all, of the discrepancies plaintiffs complain about." D's Opp'n to P's MSJ at 7. Plaintiff respond that even after the enactment of the 15-020 Amendment, out-of-state hospitals are not going to get: (1) the California "rural" floor wage index; (2) Medicare wage index reclassifications; (3) the "remote rural" definition for out-of-state hospitals remains very restrictive; and (4) the cost-to-charge ratio that is based on Medicaid (35%), rather than Medicare (22%) patients. P's MSJ at 14. In addition, as discussed above, out-of-state hospitals continue to be excluded from DSH payments.

Section 4410 of the Balanced Budget Act of 1997 established the "rural floor" by requiring that the Medicare wage index for a hospital in an urban area of a State cannot be less than the area wage index determined for that State's rural area. Vaida Decl. ¶ 13. According to Plaintiffs, the Department's use of the California "rural floor" as a Medi-Cal adjustor for urban California hospitals resulted in substantial windfall payments to 211 in-state hospitals that had nothing to do with their actual wage costs. *Id*. For FYE 2013-2014, the California "rural floor" wage index was 1.2282. *Id*. The use of this "rural floor" increased the labor component of the "base price" of 211 California urban hospitals by $977.02 (i.e., 22.82% X $4,281.42), resulting in a new total "base price" of $7,200.02, and an increase of 15.7% in the Medi-Cal reimbursement. *Id.*

With respect to Medicare wage index reclassifications, which increase wage index values, Plaintiffs assert that nationwide almost 40% of hospitals have been reclassified. Johnson Decl. Ex.3. In the case of hospitals that the Department deems "remote rural,"[34] the Department uses a

---

[34] "Remote Rural Border Hospital" is a border hospital that is defined as a rural hospital by the Federal Medicare Program, is at least fifteen (15) miles in driving distance from the nearest GAC hospital that has a basic level emergency room, and does not operate under a combined license or bill under a common National Provider Index (NPI) number with a non-remote rural

"base price" of $10,218, rather than the unadjusted "base price" of $6,223. Vaida Decl. ¶ 13. To receive the remote rural base price, a border hospital must be defined as "rural" by the federal Medicare program and meet the same remote and non-combined license/provider number standards applicable to California hospitals. Rowan Second Suppl. Decl. ¶ 4.[35]

There remains disparity between in- and out-of-state hospitals because out-of-state hospitals are being paid less. If out-of-state hospitals received the "rural" floor wage index, their base prices would have increased by 15.7%. Vaida Decl. ¶ 13. Moreover, the remote rural base price is higher than a regular base price by 64%. ($10, 218 v. $6,223). *Id*.; Compl. ¶ 18. In addition, California hospitals receive Medicare wage index reclassifications that increase their wage index values. Vaida Decl. ¶ 13. Finally, the cost-to-charge ratio for out-of-state hospitals is 22%, whereas for California hospitals the cost-to-charge ratio is 35%. P's MSJ at 14. A hospital's estimated cost on a discharge claim is determined by multiplying the Medi-Cal covered charges by a cost-to-charge ratio. Vaida Decl. ¶ 22. If there is a loss, then the hospital may qualify for a substantial additional payment. The higher the cost-to-charge ratio, the more likely it is that there will be a loss and thus an additional outlier payment. *Id.*

---

hospital. Rowan Decl. Ex. B, State Plan Attachment 4.19-A at 17.41).

[35] According to Plaintiffs, the definition of "remote rural" that the State has proposed for out-of-state hospitals is not consistent with, and is more restrictive than the definition that the Department applies to in-state hospitals. P's MSJ at 14; Plaintiffs' Findings of Fact ¶ 41(C). State Plan Amendment 15-020 defines "border hospitals" as those hospitals located outside of California that are within 55 miles driving distance from the nearest physical location at which a road crosses the California border, and includes all plaintiff hospitals. Rowan Decl. ¶¶ 11, 22. "Remote Rural Border Hospital" is a border hospital that is defined as a rural hospital by the Federal Medicare Program, is at least fifteen (15) miles in driving distance from the nearest GAC hospital that has a basic level emergency room, and does not operate under a combined license or bill under a common National Provider Index (NPI) number with a non-remote rural hospital. Rowan Decl. Ex. B, State Plan Attachment 4.19-A at 17.41). "Remote Rural Hospital" is a California hospital that is defined as a rural hospital by the Office of Statewide Health Planning and Development (OSHPD), is at least fifteen (15) miles in driving distance from the nearest GAC hospital that has a basic level emergency room, and does not operate under a combined license or bill under a common National Provider Index (NPI) number with a non-remote rural hospital." Rowan Decl. Ex. B, State Plan Attachment 4.19-A at 17.41. Plaintiffs contend that the Department should apply to the plaintiffs the same definition of a "remote rural" hospital that it applies to hospitals located in California, except that in doing this the Department would not apply any state-specific requirements that can only be met by hospitals that are physically located in the State of California. P's MSJ at 23. Plaintiffs, however, do not explain in their pleadings how many hospitals (if any) did not receive the "Remote Rural Border Hospital" designation under the 15-020 Amendment.

United States District Court
For the Northern District of California

During the oral argument, the Department argued that after the 15-020 Amendment the State became "as close as the State can get" in its alignment of in-state and out-of-state reimbursement rates. Yet, the courts have held that even a "slight disparity in the treatment of in-state and out-of-state interests may offend the dormant commerce clause." *Bontá*, 97 Cal. App. 4th at 766. For example, in *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93 (1994), the Supreme Court found that a $2.25 per ton surcharge on out-of-state waste impermissibly burdened interstate commerce despite an increase of only 14 cents per week for the average user. The Court stated that its precedents "clearly establish that the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination whether a State has discriminated against interstate commerce.'" *Id*. at 100 n. 4 (quoting *Wyoming*, 502 U.S. at 455). Hence, the fact that the 15-020 Amendment substantially lessens the disparity in treatment, but does not eliminate that disparity, does not obviate the Commerce Clause infirmity. Moreover, the Amendment does nothing to alleviate the disparity caused by the exclusion of DSH payments to out-of-state hospitals.

Because the Department continues to reimburse out-of-state hospitals at lower rates than in-state hospitals resulting in out-of-state hospitals being paid less and excludes such hospitals from DSH payments, the Department directly discriminates against out-of-state hospitals even after the 15-020 Amendment. The Department has not justified the residual disparity as required by strict scrutiny under the Commerce Clause. *Cf. New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). The Department did not advance any justification for discrimination in this case. The administrative burden argument, rejected herein, is the Department's only defense. "[A] State may validate a statute that discriminates against interstate commerce by showing that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co*, 486 U.S. at 278 (1988). It has failed to do so here.

5. <u>Equal Protection Claims</u>

In view of the holding above, the Court need not reach Plaintiffs' Equal Protection claims.

United States District Court
For the Northern District of California

The Court notes that several other courts have found that the discrimination (at least where there are significant disparities) against out-of-state hospitals violate the Equal Protection Clause even under rational basis review. *See e.g.*, *Children's Seashore House v. Waldman*, 197 F.3d 654, 661 (3d Cir. 1999) (stating that plaintiffs' Equal Protection claim for disproportionate share hospital adjustments should have survived defendant's motion to dismiss); *W. Va. Univ. Hospitals v. Casey*, 701 F. Supp. 496, 518-20 (M.D. Pa. 1988), *rev'd in part on other grounds by* 885 F.2d 11 (3d Cir.1989), *rev'd on other grounds by* 499 U.S. 83 (1991) (holding that a considerably lower Medicaid reimbursement to out-of-state hospitals violated the Equal Protection Clause); *W. Va. Univ. Hospitals, Inc. v. Rendell*, No. CIV. 1: CV-06-0082, 2007 WL 3274409, at *7 (M.D. Pa. Nov. 5, 2007) (holding that denying trauma disproportionate share hospital payments to out-of-state hospitals violated the Equal Protection Clause); *Children's Hospital & Medical Center v. Bontá*, 97 Cal. App. 4th 740, 771 (Cal. App. 1st Dist. 2002) (holding that the Department failed to demonstrate that "differential treatment of respondent hospitals on the basis of their location out of state is rationally related to a legitimate governmental purpose.").

## IV. CONCLUSION

For the foregoing reasons, the Court partially **GRANTS** the Defendant's summary judgment motion on Plaintiffs' claim under § 1396a(a)(13)(A) and **GRANTS** Plaintiffs' summary judgment motion on the ground that the discrimination in payments to out-of-state hospitals violates the Commerce Clause.

This order disposes of Docket Nos. 39 and 51.

**IT IS SO ORDERED**.

Dated: December 21, 2015

EDWARD M. CHEN
United States District Judge